## WINEMAN v. GASTRELL.

(Circuit Court of Appeals, Fifth Circuit. December 12, 1892.)

### No. 20.

1. PUBLIC LANDS—STATE GRANTS OF SWAMP LANDS—WHEN TITLE PASSES.
   The Mississippi act of March 3, 1852, by which 35,000 acres of swamp lands, received by the state under the act of congress of September 28, 1850, were "hereby granted" to the state commissioners for the improvement of the Homochitto river and their successors, for the purpose of carrying on their work, was a present grant of the title to them, although patents were to issue from the state upon certificates issued by them to any purchaser or grantee, and the title to particular tracts would become perfect upon the designation of the person entitled to take from the commissioners and an identification of the lands.

2. SAME—AUTHORITY OF COMMISSIONERS.
   Under section 2 of this act the commissioners had authority to sell the lands or grant the same for services rendered in furthering the purposes for which the commission was created.

3. SAME—EQUITY JURISDICTION.
   The lands were a trust fund for the purpose of carrying out the objects of the grant, and where the commissioners failed or refused either to pay a person employed by them in carrying on the improvements, or to issue certificates appropriating lands to such payment, a state court of equity had jurisdiction to compel them to use the lands to satisfy such indebtedness.

4. SAME.
   A person thus employed, having recovered judgment against the commissioners for his services, obtained a writ of mandamus to compel them to sell the lands to satisfy the same. The functions of the court, however, were suspended by the Civil War, and after its termination an assignee of the claim filed a petition in the same court for the appointment of a special commissioner to sell the lands, the board having failed to do so. The petition was granted, and thereafter 29,924 acres of said lands were sold by the commissioner and purchased by the claimant, the commissioner executing a deed to him. Subsequently, however, the same lands were sold by the state under the act of February 1, 1877, and to remove the cloud thus created the grantee of the former title brought the present suit. *Held*, that the state court, being a court of general jurisdiction, had authority to order the sale, and its proceedings were not subject to collateral attack, and that complainant was entitled to a decree.

5. SAME—BONA FIDE PURCHASERS—NOTICE.
   The grantees of the state under the act of 1877 could not claim superior title as bona fide purchasers, for the grant to the commissioners, the judicial sale, and the due recording of the deed from the court commissioner, were sufficient to charge them with notice. Pardee, J., dissenting.

Appeal from the Circuit Court of the United States for the Southern District of Mississippi.

In Equity. Bill by Lucy E. Gastrell against Marx Wineman to remove cloud from. title. Decree for complainant. Defendant appeals. Affirmed.

Statement by LOCKE, District Judge:

March 5, 1850, the legislature of Mississippi by an act provided for the appointment of the several persons therein named as a board of commissioners for the improvement of the Homochitto river, authorizing them to receive any appropriations granted by the state or voluntary contributions from citizens, and to expend the sums of money so received for the purpose of removing obstructions in said stream, and excavating and digging a canal into Buffalo bayou, and to perform any other such acts as might tend to the improvement of the navigation of said stream as they might deem expedient and proper. Afterwards, on the 28th day of September, the same year, congress, by act of that date, donated to Mississippi the swamp and overflowed lands within its limits, and subsequently, by an act approved March 3, 1852, the legislature of that state declared that 35,000 acres of these swamp lands granted by act of congress, and located in the Homochitto swamp, "be, and the same are hereby, granted to the commissioners of the Homochitto river, created by an act regulating and defining the powers of the commissioners of the Homochitto river, approved March 5, 1850, and to their successors in office, for the purpose of removing all obstructions in said stream, to create an outlet for said river through Old river, and by a canal into Buffalo bayou, and the removal of obstructions in said bayou from the said canal to its mouth, for the effectual drainage of said swamp, the improvement of the navigation of the Homochitto river, and to make a levee across the present outlet of said river on the Mississippi."

The second section of said act provided that the commissioners might sell and dispose of any of said lands for the purposes mentioned, and cause certificates to issue to any purchaser or grantee, specifying the number of acres and number of section, or subdivision of section, transferred, upon the presentation of which certificate the secretary of state should issue a patent to the purchaser for the land sold.

The board had been regularly organized, and, as it appears from the record, appointed and employed one James Aiken as general superintendent, to look after the interests of said board and said land, and take general supervision and care of the improvements about to be made. It is alleged, and appears in evidence, that said Aiken entered upon such duties of superintending the improvements, purchased materials, hired laborers, and incurred expenses. He was to have a monthly compensation for his services, and a certain amount per diem for his expenses. There is nothing in the record showing how much was accomplished in the way of improving the navigation of the river or cutting the canal, but after a while the efforts appear to have been abandoned. There were several attempts at settlement of the claims made by Aiken for the amounts alleged to be due him, but they were unsuccessful, and on June 1, 1855, he commenced a suit against the commissioners in the vice chancery court in Natchez, by a bill for an account and settlement for his services and the amounts expended by him in making such improvements as he had made, and for a discovery of the assets of the board, out of which to obtain satisfaction of the amount which might be found due him. This suit progressed until May 1, 1858, a decree was rendered by the chancery court of Adams county, to which the suit had been transferred, for the sum of $8,182.55 in favor of said Aiken against the said board of commissioners, and upon which an execution was issued to the sheriff, and by him returned nulla bona.

On the 28th of September, 1859, Aiken filed his petition in said court, praying a mandamus to compel the commissioners to sell some of the lands which had been granted them, to pay him the amount due on said decree. Upon a demurrer being filed to said application by the board, it was overruled, and a mandamus issued, returnable to the May term, 1861. The court having been suspended by reason of the war, no further action appears to have been taken in the cause until the October term, 1866, when George N. Raymond, to whom

Aiken had assigned the former judgment, filed a petition in the name of Aiken, praying the appointment of a special commissioner to sell said land, the board having failed to do so. An order was granted and decree appointing Samuel Wood such commissioner, and directing him, after advertising the time and place in some newspaper published in the city of Natchez, to sell so much of said lands to the highest bidder for cash as might be necessary to pay said demand. The record shows that the commissioner proceeded to advertise for sale a large amount of land by description, by townships, sections, and lots, aggregating, as stated in said advertisement, 29,924 acres, more or less. There is no record of a report of sale by the commissioner, but it appears that an order was entered on the 30th day of April, 1872, approving the sale of said lands to George N. Raymond, assignee of James Aiken, for the sum of $14,-995.95,—an amount not sufficient to cover the judgment, with accumulated interest and costs; whereupon the commissioner executed a deed of conveyance of the lands, among which were those in question in this suit, to said George N. Raymond, and they passed by record of conveyance, which has been unquestioned in this case, to Lucy E. Gastrell, the appellee. The commissioner's deed was filed for record and duly recorded in the clerk's office of Adams county, in which the lands were situated, June 3, 1872. It is not denied that the lands thus sold were swamp and overflowed lands, and situated in Homochitto swamp.

The appellant claims under patents issued by the state of Mississippi to several parties under the act of the legislature of Mississippi passed on the 1st day of February, 1877, by which it was provided that a commissioner of swamp lands in the state should be appointed and authorized to sell all swamp lands remaining unsold at the price of 25 cents per acre. The bill herein was filed under the provisions of section 1833, Code 1880, of the state of Mississippi, by Lucy E. Gastrell, the appellee herein, for the removal of the cloud upon the title to this land, claiming that she had both legal and equitable title therein, and that the title held by Marx Wineman, the assignee of several parties who had purchased under the act of 1877, was a cloud thereon, and praying to have such cloud canceled and removed. In the court below the matter was heard, and the title of the complainant was held to be good, and a decree entered declaring the defendant's title in these lands void, and that the same be canceled and set aside. From this decree an appeal has been taken to this court, alleging as ground for error that the court erred in overruling the demurrer to the bill; that the court erred in admitting in evidence the record of the proceedings in the cause against the land commissioners in the superior court of chancery in Adams county, the same being incompetent, said court having no jurisdiction, and the sale thereunder conferred no title; that it was error for the court to admit the certificate and list of land of Brougher, secretary of state, and it was error to admit the pencil marks and memoranda on the margin of the swamp-land commissioner's book in evidence in the case; that it was error to render a decree in favor of the complainant; that the court should have made a decree dismissing the bill.

Frank Johnston, for appellant.
A. M. Lea, for appellee.

Before PARDEE and McCORMICK, Circuit Judges, and LOCKE, District Judge.

LOCKE, District Judge, (after stating the facts.) The two questions upon which a decision of this cause must turn are: First, whether the state by the act of March 3, 1852, conveyed title to the 35,000 acres of land therein granted to the board of Homochitto commissioners; and, secondly, if so, had the chancery court of Adams county jurisdiction of the parties and matter at issue in the suit of Aiken against that board, so as to give validity to the sale made under its decree.

In regard to the first question, the language used in the granting

act is all that could be required to declare a grant in praesenti, and to declare it anything less would require other grounds than are found in the expressions of the act. Legislative grants have not been infrequent in either our national or state legislation, and have many times received judicial construction, and wherever such language as was used in this act has been found, with no further modifying or limiting clause, it has been held to be a present grant, conveying title upon the final identification of the land granted.

In Rutherford v. Greene's Heirs, 2 Wheat. 196, it was contended that the absence of the words "are hereby" defeated the grant as a present conveyance; but it was held otherwise. In this act such words were used.

In Lessieur v. Price, 12 How. 72, in speaking of the grant of four sections of land to the state of Missouri by the act of 6th of March, 1820, to be subsequently located, the supreme court says it was a present grant, wanting identity to make it perfect, and the legislature was vested with full power to select and locate the land, and the act vested a title in the state of Missouri of four sections, and the selection made gave precision to the title, and attached it to the land so selected.

In Fremont v. U. S., 17 How. 542, the difference between a concession with conditions precedent and a grant in which a title passed is plainly shown, and the general principle of justice and municipal law was declared to be that such a grant as was under consideration in the case of Rutherford v. Greene's Heirs for a certain quantity of land by the government, to be afterwards surveyed and laid off, vests in the grantee a present and immediate interest.

In Schulenberg v. Harriman, 21 Wall. 60, the court says: "That the act of congress passed a present interest in the hands designated there can be no doubt. The language used imparts a present grant, and admits of no other meaning. The language of the first section is 'that there be, and is hereby, granted' the lands specified."

In Van Wyck v. Knevals, 106 U. S. 360, 1 Sup. Ct. Rep. 336, where land had been granted to the state of Kansas for the use and benefit of the St. Joseph & Denver Railroad, and a provision made for the manner in which patents to the railroad company might be issued by the secretary of the interior upon the certificate of the governor of Kansas that any section of the road had been completed, the grant was held to be one in praesenti to the state, and that it attached and became complete as soon as the route of the road was definitely determined, although no patent or evidence of title ever passed to the state, but was to pass directly to the railroad company upon certificate, as in this case. Upon that question the court says: "This is only a mode of divesting the state of her trust character, and of passing the legal title held by her to the party for whose benefit the grant was made. The legal title under the grant goes to the state, but the equitable right vests in the company." These are but a few of the numerous cases where this same principle is announced. Railroad Co. v. Smith, 9 Wall. 95; Leavenworth, etc., R. Co. v. U. S., 92 U. S. 733; French v. Fyan, 93 U. S. 169; Martin v. Marks, 97 U. S. 345.

We consider that this was a present grant, the commissioners taking the legal title to convey to any one instrumental in carrying out the purposes of improving the Homochitto river, and it only required the designation of the person so entitled by payment or appropriation by order of said commissioners, and an identification of the land, to make it perfect. It is plainly declared in words in Missouri, K. & T. Ry. Co. v. Kansas Pac. Ry. Co., 97 U. S. 497, as it is held in numerous other cases, that legislative grants do not require such identification of the thing granted at the time of the grant as is required by conveyances at common law, but whenever there exist rules or directions by which subsequent identification may be had, the inchoate or imperfect title dates from the passage of the act, to attach whenever such identification can be made. St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 5, 11 Sup. Ct. Rep. 389; Wright v. Roseberry, 121 U. S. 500, 7 Sup. Ct. Rep. 985; Grinnell v. Railroad Co., 103 U. S. 742; Van Wyck v. Knevals, supra.

It has been strongly urged in behalf of appellant that the title did not pass from the state until the provisions of the act providing for granting certificates and patents had been complied with, and that such construction was necessary for the protection of the public, and the preservation of the integrity of the office of the land department of the state; that there should be evidence of sale in that office before such grant could be considered perfected, and the land identified, and segregated from the public domain.

The argument certainly possesses cogency of reasoning, and, were it a new question, never considered by the supreme court, it might be accepted; but, in view of the decision of that court in Railroad Co. v. Smith and Van Wyck v. Knevals, supra, we do not consider that that view of the law can be accepted. In Railroad Co. v. Smith the question was whether the selection of the swamp lands by the secretary of the interior, and issuing a patent therefor, as was provided for in the second section of the swamp-land grant of September 28, 1850, was necessary to convey title. In that act the language had been much more plain and direct than in this, it being that the secretary of the interior should make out an accurate list of the lands, and cause a patent to be issued to the state, "and on that patent the fee simple to said lands shall vest in said state;" but, notwithstanding this positive declaration that the fee shall vest on that title, the supreme court held that such patent was not necessary to determine the rights of the state. The court says:

"The right of the state did not depend on his action, but on the act of congress; and, though the states might be embarrassed in the assertion of this right by the delay or failure of the secretary to ascertain and make out a list of these lands, the right of the states to them could not be defeated by that delay."

In French v. Fyan, supra, although the grant to the railroad company under which plaintiff held had been made by act of 1852, and the land certified under that grant to the company in 1854, and the patent of the secretary of the interior to the state under the swamp-land grant was not issued until 1857, yet it was held that the swamp-land grant of 1850 conveyed title.

In Van Wyck v. Knevals, where the title was between a claimant who alleged title under a railroad grant and one who had purchased from the land office, and paid full price for the land before the notice of the designation of the line of the road had been received at that office, and had received his patent, it was held that, notwithstanding there had been no notice of the withdrawal of the land received, and he had purchased in good faith, yet the title had passed out of the United States by the grant, and his patent was invalid.

The language of the act under which that case arose was peculiar in its construction, and would appear to demand the construction claimed in this case, namely, that no title passed, but remained in the United States until the patent issued. It was that the lands granted "shall inure to the benefit of the said company as follows: When the governor of the state of Kansas shall certify that any section of ten consecutive miles of said road is completed in good, substantial, and workmanlike manner, then the secretary of the interior shall issue to the said company," etc. This language would seem to be much more explicit in declaring the intention of congress to retain title until the issuance of the patents, but the supreme court says the grant "passes the title as fully as though the sections had then been capable of identification."

We have failed to find any case where the land has been capable of any reasonable selection or identification by survey, description as to quantity or quality, or location, in which it has been held that the title did not pass until patent issued.

In this case there appears to have been but 35,723 acres of swamp land in the Homochitto swamp. Of this, 35,000 were covered by the grant. Probably it was the intention of the legislature to grant the entire body of land for the purpose proposed, but there were 723 acres more than were contemplated. In view of that state of facts, it would seem perfectly competent for the swamp-land office of Mississippi to have preserved its integrity and protected the public by recognizing the grant as having attached to 35,000 acres of this land, and so limited its right of disposal. The reason for the general rule that no title can pass by any grant in favor of a railroad until the route has been finally determined, and a map designating it filed with the secretary of the interior, where a comparatively small amount, otherwise undescribed and unlocated, is to be selected from the vast body of public land, would not appear to be required in this case, where the land has been described and located, and can very readily be determined by limiting any sale to the small surplus found answering the same description.

The act of March 5, 1850, originally organizing the board of commissioners, gave them full authority to do and perform all such acts as would tend to the improvement of the navigation of the river in their discretion. Unquestionably this gave them power to incur debts by employing labor or making contracts, and to provide for their payment. This was not only a privilege, but a duty. The second section of the act of March 3, 1852, under consideration, provided that they were authorized and empowered to sell and dispose of any of said lands for the purposes mentioned in the act, and issue certifi-

cates specifying the number of acres such purchaser or grantee might be entitled to by description. They were therefore authorized to sell or grant in payment for services rendered any such of the entire grant as they and the purchaser or grantee might agree upon, and upon such sale or grant it must be considered that such land was identified, and the grant from the state became complete. It is true that certificates and patents were to issue; but the legal title having passed by the grant to the commissioners, and their grantee becoming equitably entitled to a certificate and patent, his right could not be defeated by their refusing the one, and, consequently, the secretary of state withholding the other. There can be no question but what it was the intention of the legislature making the grant to enable the commissioners to grant, convey by sale, or dispose of, said lands in any way to accomplish the purposes of the grant; and whether the powers of a court of equity could be invoked to compel such commissioners to so use these lands as to satisfy such indebtedness as had arisen in their carrying out the purposes for which the lands were granted, and whether the action of the chancery court in making sale of such lands, and thereby identifying them, could take the place of a conveyance by the commissioners and their grantee, is the remaining question.

We consider this to have been a trust fund held for a certain purpose, and the commissioners acting in the capacity of trustees. The supreme court, in Van Wyck v. Knevals, supra, speaks of the trust character of the state when occupying a similar position, and the only difference is that while in that case the beneficiary of the trust was named as the railroad company, in this case the cestui que trust must be considered as any one who, by the paying of money or contributing valuable aid or assistance in carrying out the purpose of the grant, became entitled to the benefit of it. The commissioners had accepted this grant for the purpose of compensating, either directly, by grant of land, or indirectly, by paying the price for which the land was sold, those rendering beneficial aid towards that purpose. An element of trust will always give jurisdiction in equity. Had any one, with the co-operation of the commissioners, selected any of this land and paid for it, we think there can be no question but what he could have resorted to a court of equity to compel an issuing of the certificate and patent, or have the want thereof supplied by its decree; and the ground of the suit, as alleged by Aiken's bill, would seem to stand upon the same foundation. He alleged an indebtedness of the board of commissioners, incurred directly in carrying out the purpose of the grant, and for which it would.appear that the trust might be held.

If the court, as a court of equity to which application was made, had jurisdiction to hear and determine the questions there put in issue, the re-examination of them is beyond our province, whether their determination was correct or otherwise. The doctrine of the courts of this country is firmly established that if the court in which the proceedings took place had jurisdiction to render the judgment which it rendered, no error in its proceedings which did not affect. the jurisdiction will render the proceedings void; nor can such errors

be considered when the judgment is brought collaterally into question. The court in which these proceedings were had was a court of general jurisdiction, and every presumption must be made in favor of the validity of its proceeding not inconsistent with the record.

If the commissioners neglected, declined, or refused to make a grant of land, or otherwise provide for the payment of debts which they had incurred in executing the trust which they had accepted, we consider that the complainant was authorized to apply to a court of equity to compel such action, and, in event of continued refusal, perform what was found to be the duty of the commissioners by an agency of its own. This was done, and a commissioner appointed, and empowered to dispose of so much of this land as was found necessary to pay the amount which the trust fund was found indebted to the complainant in that court.

The land had been identified in the grant by character and location, and, could it have been properly assumed or appeared that there was but the amount granted that would answer the description, we consider that the grant would have been perfect and complete at that time. As it was, it appears from the list certified under seal of the secretary of state of swamp lands on the Homochitto river, and those which had been conveyed by the state, that there was not at the time when the sale was ordered the number of acres granted remaining unsold. It does not appear that any further selection or identification would be necessary to complete and perfect the title given by the grant. If so, the selecting for sale, and selling under the orders of the court, any lands fully answering to the description, would, in our opinion, be sufficient.

If the chancery court of Adams county had jurisdiction, (which we find it had,) no objections can be made to its proceedings, judgments, or decrees, no matter what may have been the final result, or how wasteful, as it is claimed, of the fund. No other disposition of any of the land had been made by the state previous to the selection by the commissioner appointed by the court, at which time we consider the terms of the grant had been sufficiently complied with to perfect the title; and a selling and disposing of the land so selected was but the enforcement of an ordinary equitable power. Such is shown to be the law and practice of courts of equity in Mississippi. Gibbs v. Green, 54 Miss. 610.

It is strongly urged by appellant that he is a purchaser for value without notice, and his title should therefore prevail. The conclusion at which we have arrived is that the grant from the state was a grant in praesenti, completed and perfected by selection and sale; that the grant, judicial sale, and due recording of the deed of the court commissioner was sufficient to put the purchaser upon notice. There has been no question of insufficiency of title in complainant subsequent to the sale, and, when once that is established, that determines the question. There was no appeal from the finding of the court below of an amount due the respondent for taxes paid by him, and that decree in his favor will stand, with interest, and in all things the decree of the court below is affirmed, with costs, and the cause remanded for further proceedings to be taken in accordance with this opinion.

PARDEE, Circuit Judge, (dissenting.) I dissent from the opinion of the court in this case, because its result is to destitute an innocent purchaser on the theory of notice, when, so far as the record shows, he could have had no notice. I think that there can be no question that the act of the legislature of the state of Mississippi, entitled "An act granting swamp lands to the commissioners of the Homochitto and Leaf rivers, for draining said swamp, and for other purposes," approved March 3, 1852, and under which the appellee in this case claims title, is to be taken and construed as a law as well as a conveyance, and that the methods provided in said act by which the swamp lands granted to the commissioners of the Homochitto river are to be identified and definitely fixed, and the grant made is to attach to any certain lands, are to be strictly followed, and the act strictly construed as between a purchaser from the state without notice, who acquires title prior to the definite location of the grant, and one claiming under the general grant. Shepley v. Cowan, 91 U. S. 330; Missouri, K. & T. Ry. Co. v. Kansas Pac. Ry. Co., 97 U. S. 491; Hall v. Russell, 101 U. S. 503–509.

The second section of the act is as follows:

"Sec. 2. Be it further enacted that said commissioners of the Homochitto river are hereby authorized and empowered to sell and dispose of any of said lands for the purposes mentioned in the first section of this act, and to order and cause certificates to issue to any purchaser or grantee of said lands, specifying therein the number of acres such purchaser or grantee may be entitled to, and the number of the sections or subdivisions of sections transferred, and the township and range in which it is situated; and upon the presentation of said certificate, under the hand and seal of the treasurer of said board of commissioners, to the secretary of state, he shall issue to the person so entitled a patent to the lands described in the certificate aforesaid, in the same manner as patents are now required to issue for internal improvement lands by act approved February 23, A. D. 1848; and said secretary shall be entitled to a like compensation for his services, in the same way and manner as is provided in said act of February 23, 1848."

And the sixth section is as follows:

"Sec. 6. Be it further enacted that the secretary of state shall keep a record of the numbers of the sections and subdivisions of sections of land located in the said Homochitto swamp, under the provisions of said act of congress of September 28, 1850, and transmit a copy of the same, under his hand and seal, to the secretary of said board of commissioners of the Homochitto river."

It is apparent to me from these two sections that the state intended to retain the title to the lands in question, with the intention and power of continuing the sale of the swamp lands until, by selection on the part of purchasers, and presentation of such selection for record with the secretary of state, the land so definitely selected and reported should be definitely located as a part of the lands granted to the commissioners of the Homochitto river. Now, conceding in this case that the grant to the commissioners of the Homochitto river conveys a present interest in the Homochitto swamp lands; conceding, further, although to my mind a very doubtful proposition, that the proceedings had in the state chancery court in the suit of Aiken were in all respects equivalent to a selection by purchasers, and that the decree of confirmation was equivalent to the certificate of the treasurer of the board that the persons

purchasing were entitled to the sections and subdivisions of sections alleged to have been so sold,—still, it seems to me that those proceedings did not, and could not, so locate and definitely fix the lands sold as a part of the said Homochitto grant, because no report thereof was presented to the secretary of state, which presentation was necessary to segregate the lands claimed from the public domain of the state, and definitely locate and identify the grant.

In the case of Land Co. v. Griffey, 143 U. S. 32-38, 12 Sup. Ct. Rep. 362, the supreme court considers and determines when the title attaches under a legislative grant in praesenti, but containing provisions as to the definite location of the lands granted. A quotation from the opinion of the court will embrace all that I care to further say as to the present case:

"The first and principal question is at what time the title of the railroad company attached,—whether at the time the map of definite location was filed in the general land office at Washington, or when, prior thereto, its line was surveyed and staked out on the surface of the ground. While the question in this precise form has never been before this court, yet the question as to the time at which the title attaches, under grants similar to this, has been often presented, and the uniform ruling has been that it attaches at the time of the filing of the map of definite location. Grinnell v. Railroad Co., 103 U. S. 739; Van Wyck v. Knevals, 106 U. S. 360, 366, 1 Sup. Ct. Rep. 336; Railway Co. v. Dunmeyer, 113 U. S. 629, 634, 5 Sup. Ct. Rep. 566; Walden v. Knevals, 114 U. S. 373, 5 Sup. Ct. Rep. 898; U. S. v. Missouri, K. & T. Ry. Co., 141 U. S. 358, 375, 12 Sup. Ct. Rep. 13.

"In Van Wyck v. Knevals, where the question arose between Knevals, the grantee of the railroad company, and Van Wyck, who had entered the lands at the local land office after the filing of the map of definite location with the land department, but before notice thereof had been received at such local land office, this court said: 'The route must be considered as "definitely fixed" when it has ceased to be the subject of change at the volition of the company. Until the map is filed with the secretary of the interior, the company is at liberty to adopt such a route as it may deem best, after an examination of the ground has disclosed the feasibility and advantages of different lines. But when a route is adopted by the company, and a map designating it is filed with the secretary of the interior, and accepted by that officer, the route is established; it is, in the language of the act, "definitely fixed," and cannot be the subject of future change, so as to affect the grant, except upon legislative consent.'

"And in Railway Co. v. Dunmeyer, it is also said: 'We are of opinion that under this grant, as under many other grants containing the same words, or words to the same purport, the act which fixes the time of definite location is the act of filing the map or plat of this line in the office of the commissioner of the general land office. The necessity of having certainty in the act fixing this time is obvious. Up to that time the right of the company to no definite section or part of section is fixed. Until then many rights to the land along which the road finally runs may attach, which will be paramount to that of the company building the road. After this no such rights can attach, because the right of the company becomes by that act vested. It is important, therefore, that this act fixing these rights shall be one which is open to inspection. At the same time it is an act to be done by the company. The company makes its own preliminary and final surveys by its own officers. It selects for itself the precise line on which the road is to be built, and it is by law bound to report its action by filing its map with the commissioner, or rather in his office. The line is then fixed. The company cannot alter it so as to affect the rights of any other party.'

"The reasoning of these opinions is applicable here. The fact that the company has surveyed and staked a line upon the ground does not conclude it. It may survey and stake many, and finally determine the line upon which it will build by a comparison of the cost and advantages of each; and only when,

by filing its map, it has communicated to the government knowledge of its selected line, is it concluded by its action. Then, so far as the purposes of the land grant are concerned, is its line definitely fixed; and it cannot thereafter, without the consent of the government, change that line so as to affect titles accruing thereunder. In accordance with these decisions, it must therefore be held that the line was not definitely fixed until the 13th of October, 1856."